PETERSON v. INDUSTRIAL COMMISSION et al.

No. 6441. Decided October 7, 1942. (129 P. 2d 563.)

See 71 C. J. Workmen's Compensation Acts, sec. 912; 28 R. C. L., 827.

*H. Maurice Harding* and *Christenson & Christenson*, all of Provo, for appellant.

*Grover A. Giles*, Atty. Gen., and *F. A. Trottier*, of Salt Lake City, for respondents.

LARSON, Justice.

Certiorari to review the action of the Industrial Commission denying compensation. Parley Peter Peterson, husband of applicant, was employed by defendant, Board of Education, as a school janitor. On January 13, 1941, while pushing a heavy broom mop (about 25 pounds) up a ramp in the school building, he sustained an accidental injury which ruptured the left saphenous internal vein half way between the knee and the hip joint. From this he developed a thrombophlebitis in both legs and a series of pulmonary embolisms, and on February 17 suffered a cerebral embolism or lesion causing a flacid paralysis of the right side, from which he

died February 23. Defendant, State Insurance Fund, as insurance carrier for the Board of Education admitted the injury but denied that the cerebral emboli causing death resulted from the accident. The case was heard before Commissioner Jugler who recommended full compensation for death. No order was entered until after Commissioners Jugler and McShane had been replaced by two new members on the Industrial Commission. An order was then entered denying compensation on the ground that death did not result from the accident. Plaintiff brings certiorari to review and annul the order. But one question is presented: Does the record compel or necessitate a finding that death was due to the accident? Or to put it otherwise, was the Commission arbitrary in not finding from the record that the cerebral embolism from which Peterson died was the result of the injury he suffered on January 13?

Where the evidence will sustain different conclusions, we do not weigh the evidence and draw our own conclusions therefrom. *Utah-Idaho Cent. R. Co.* v. *Ind. Comm.*, 71 Utah 490, 267 P. 785; *Parker* v. *Ind. Comm.*, 78 Utah 509, 5 P. 2d 573; *Hauser* v. *Ind. Comm.*, 77 Utah 419, 296 P. 780; *Kent* v. *Ind. Comm.*, 89 Utah 381, 57 P. 2d 724. We uphold the conclusion of the commission if reasonable minds, in view of and from the evidence in the record, could so conclude. But to sustain the conclusion of the Commission the evidence must be substantial evidence, competent evidence, evidence upon which a reasonable mind, a judicious mind, may be content to rest its judgment. As stated by Mr. Justice Straup in *Kavalinakis* v. *Ind. Comm.*, 67 Utah 174, at page 187, 246 P. 698, at page 702:

"This court in a number of instances has uniformly held that an order of the commission granting an award would not be disturbed if there is any substantial competent evidence to support it; and when on the record there was no substantial competent evidence to support the award this court without hestation annulled it, not because the order was made capriciously, but because there was no evidence to support it. Now I think the same principle of law applies to the converse of the proposition; that is to say, the commission may not any

more make an order refusing an award against undisputed competent evidence demanding an award than to make one granting an award without evidence to support it. In other words, if the order in the one instance granting an award is not supported by any substantial competent evidence, and in the other refusing an award is against the undisputed competent evidence demanding it, the order in neither instance can be upheld.

\* \* \* \*

"Notwithstanding the commission as to this, like a jury, is the sole judge of the facts, the credibility of witnesses, and the weight to be given to their testmony, nevertheless, it, like a jury, is required to take as true, undisputed or uncontradicted evidence, if not opposed to probabilities or common knowledge, or contrary to natural or physical laws, or inherently improbable, or inconsistent with circumstances in evidence, or contradictory in itself, or does not from the very nature of things come from witnesses directly interested, and it is impossible to secure opposing testimony, or where the witnesses from whom comes the evidence are impeached or otherwise discredited."

In the same case Mr. Justice Frick on page 181 of 67 Utah, on page 700 of 246 P. put it thus:

"The commission may not, without any reason or cause, arbitrarily or capriciously refuse to believe and to act upon credible evidence which is unquestioned and undisputed."

In the instant case we are not asked to determine if there is any evidence to support the finding of the commission. We are asked to determine that the probative force of the evidence is such as compels a finding contrary to that made by the commission. The commission having denied an award, found no liability on the insurance carrier or employer, we are asked to declare that the evidence requires or compels a holding to the contrary; that the findings are so against the evidence as to find no support therein; that there is nothing in the evidence upon which a reasonable mind, a judicious mind could rest in arriving at a conclusion, and therefore the conclusion must have been arrived at arbitrarily or capriciously without regard to the evidence. See discussion in *Kavalinakis* v. *Ind. Comm.*, and *Gagos* v. *Ind.*

*Comm.*, 87 Utah 92, 39 P. 2d 697, 699; on rehearing 87 Utah 101, 48 P. 2d 449; also *Kent* v. *Industrial Commission*, supra.

In the Gagos case, Mr. Justice Moffat stated the rule thus:

"But, on the other hand, when there is nothing in the record to weigh or balance against uncontradicted material, substantial, competent evidence, it likewise becomes a question of law that a finding must accord with such uncontradicted material, substantial, competent evidence. If such evidence demands an affirmative finding, such finding must be made; if a negative finding, then a negative finding must be made."

And Mr. Justice Hansen on page 100 of 87 Utah, on page 700 of 39 P. 2d quoting from 23 C. J. § 1791, p. 47, said:

"Uncontradicted evidence should ordinarily be taken as true, and cannot be wholly discredited or disregarded if not opposed to probabilities, or arbitrarily rejected, even though the witnesses are parties or interested; and where the evidence tends to establish a fact which it is within the power and to the interest of the opposing party to disprove, if false, his failure to attempt to disprove it strengthens the probative force of the evidence tending to prove it. Uncontradicted evidence is not, however, necessarily binding on the court or a jury but may be disbelieved where it is contrary to natural or physical laws, opposed to common knowledge, inherently improbable, inconsistent with circumstances in evidence, or somewhat contradictory in itself, especially where the witness is a party or interested, or where in the very nature of things, it is impossible to secure opposing testimony."

Such being the rules and tests laid down by this court, we will now examine the record.

Upon less evidence than this, upon evidence of less weight or convincing power than this, any conclusion would be haphazard, guesswork, one arrived at arbitrarily, and not by the thoughtful consideration and weighing processes of a judicious mind. To be a reasonable conclusion it must be one for which from the evidence one can give reasons which a judicious mind would deem worthy of consideration, upon which it would be content to rest a judgment. In the case of denial of compensation, the record

must disclose that there is material, substantial, competent, uncontradicted evidence sufficient to make a disregard of it justify the conclusion, as a matter of law, that the Industrial Commission arbitrarily and capriciously disregarded the evidence or unreasonably refused to believe such evidence. See *Kavalinakis* v. *Industrial Commission,* supra and *Gagos* v. *Industrial Commission,* supra.

Is the conclusion of the commission that the cerebral embolism causing death was not a result of the rupture and thrombosis of the saphenous vein sustained by any substantial competent evidence? If there is substantial, competent evidence to sustain it, then it cannot be said to be arbitrary or capricious. If on the other hand there is no substantial competent evidence to sustain it, and there is material substantial competent, uncontradicted evidence impelling a contrary conclusion, then the holding would be unreasonable, arbitrary, capricious, and could not stand.

All the evidence pertaining in any way or in any degree to the cause of death consists of the case record of deceased's illness kept by Dr. Arnold Robinson, the attending physician; the death certificate issued by Dr. Robison; the testimony of Dr. J. W. Aird, who during the period between the injury and death twice examined deceased in consultation with Dr. Robison; the testimony of Dr. L. L. Cullimore, called as an expert by the defendant, insurance carrier; and a written expert opinion by Dr. L. E. Viko, based upon an examination of the record after the conclusion of the hearing at the request of the commission. The case record shows the accident on January 13, development of thrombophlebitis in left leg, and a series of pulmonary embolisms beginning February 4, all undisputedly caused by the thrombophlebitis in the leg. On February 14, a pulmonary embolism (this would result in increasing the pressure of the blood in the right auricle of the heart), was accompanied by a jerking of the left leg similar to that which often occurs on and is suggestive of a lesion of the middle left cerebral artery. On February 16 there was another pulmonary embolism

(which would further increase the pressure of the blood in the right auricle of the heart). And there was also an embolism or plugging of an artery in the right leg; and on February 17, a cerebral embolus or lesion, evidenced by a jerking of the right leg and followed by paralysis of the right side from which death resulted on February 23. The record closes with notation of death from

"1. Cerebral emboli causing paralysis right side.
"2. Following thrombosis left internal saphaneous vein."

The death certificate reads:

"Immediate cause of death: cerebral emboli causing paralysis right side.
"Due to: Following thrombosis left internal saphaneous vein.
"Due to rupture Jan. 13."

Dr. Robison died before the hearing and so could not further amplify his rather complete written records. Dr. Aird testified that during the illness of deceased he had twice visited him in consultation with his physician, Dr. Robison, and each time found the patient suffering from thrombophlebitis as a result of the accident, also from pulmonary embolisms as a result of the leg conditions. He was then asked:

"Doctor in your opinion was the death of deceased connected with the alleged injury, his condition when you seen it?" He answered, "Yes, I would be strongly of the opinion that it was * * * undoubtedly to my mind he got an embolus from the lung condition to the brain."
"What do you attribute that lung disorder to?"
"To an embolus."
"Now doctor, you have stated from this embolism in the lung that he got a clot in the brain. Is it physiologically possible?"

The doctor answered that it was. That it was possible to have a cerebral embolism from an embolism originating in the venous system in another part of the body.

Dr. Cullimore, called as an expert by the insurance carrier, in answer to a hypothetical question embracing most of the facts developed in the case, stated that

"It is questionable whether it [the accident] was the direct cause of death, but probably an indirect cause of death. The direct cause would be the cerebral embolus."

The indirect cause could be an aftermath of the thrombosed vein. Such things actually do occur.

"This man may have had a thrombus set up in a vein in the brain, or he may have had it in the liver * * * or any place because of the fact that he had it existing down here [in the leg]." "This man had it extensive and it is more likely it was a migratory thing." When asked: "You think there was a connection between the accident and the final cerebral condition?" the doctor replied, "It is possible."

That is the full record at the close of the hearing. The commission on its own motion submitted the record to Dr. L. E. Viko for his opinion on a medical interpretation of the record. Dr. Viko in a very cogent and lucid analysis of the medical data available, backed by citation of medical authorities, expressed the opinion that the record was clear that the cerebral lesion which caused death was due to the emboli from the vein in the leg. He points out how every step, even prior pulmonary embolisms, with consequent increase in auricular blood pressure, conditions conducive to and perhaps necessary for venous emboli passing into the general arterial systems, existed in this case, even timed right for such things to happen. Dr. Viko states in his opinion:

"The first of these considerations means that at the same time as the pulmonary embolism of February 14th there was a lesion though temporary of the left middle cerebral artery, and the second consideration means that at the same time as the pulmonary embolism of February 16th there was a plugging of an artery in the right leg. The coincidence in time of these widely separated occlusions of arteries in lung, leg and brain is too clear to justify one assuming that in the case of the lung artery the plugging was due to an embolism in the leg and that the plugging of the other two arteries was independent therefrom as if due to thrombosis or hemorrhage in each of those other

arteries. It therefore seems only reasonable to assume that the plugging in each of the three arteries had a common origin, and since as noted above the origin of the pulmonary emboli lays almost certainly in a vein in the leg, that the plugging of the cerebral artery and the artery of the leg was also due to the emboli from the vein in the leg."

That is all the evidence before the commission on the only question at issue. Dr. Robison's record indicates that he considered the cerebral condition the result of the leg injury. Dr. Aird's opinion was positive to the same effect. Dr. Cullimore recognized the connection as probable ∎ and Dr. Viko points out that any other conclusion would not be medically sound. As to the cerebral lesion being the result of emboli from the leg there is no difference of opinion among the doctors. As to the process by which the emboli passed from the leg to the brain, the doctors each described a different possible process. But the process or route traveled by the emboli is merely incidental. In enters into the picture only to see whether or not it is possible for thrombophlebitis in the leg to produce an arterial embolism in the brain. All the evidence is in accord that it can do so. And all the evidence is in accord that in this case it did do so. There was therefore no conflict in the evidence on any material issue. Since the commission was not required to find and did not make a finding with respect to how the emboli from the leg reached the brain, but merely found it did not do so, that finding is directly contrary to the undisputed evidence of all the doctors, not only that it could do so but that in this case it did so. The extremely lucid opinion of Dr. Viko, in detail as to processes and probabilities, backed by citation of highest medical authorities, supported by the opinion of all the other doctors that the brain lesion resulted from the leg condition, is as said by the doctor too clear to justify one in assuming the contrary. There is no evidence in the record, no facts as to the case or its developments, no conflicts in the testimony, no interest of witnesses, no matters of general knowledge or medical knowledge or opinion to cast any doubt or afford any room for doubt as to

the truth or force of the testimony on the question. As stated by this court in one of the cases cited supra: The failure of an attempt to disprove a fact lends weight to its force. When Dr. Cullimore, called by plaintiff to show that the leg condition could not cause an emboli in the brain, expressed the opinion that it could and probably did, with the statement that such things do happen (his being the only testimony offered by plaintiff), removes any room for doubt as to the evidence of the other doctors. On the record submitted to us the evidence, uncontradicted and unquestioned, consistent with itself, with all general knowledge, and with medical knowledge, opinions, and authorities, compels a finding that the cerebral embolism or lesion from which Peterson died resulted from the leg condition, admittedly the result of the accident.

The order of the commission denying compensation is vacated and set aside.

MOFFAT, C. J., and McDONOUGH, J., concur.

WOLFE, Justice (concurring).

I concur because I think not only is this a case of uncontradicted testimony of a single interested witness but of various reputable physicians in regard to cause and ultimate effect which was corroborative of two facts which even the lay mind would naturally expect to be related in the manner of cause and effect.

I think the test laid down in the Gagos case is too broad. As stated in the Kavalinakis case, the commission acting as a jury was not bound to find in favor of the uncontradicted evidence. If the witness is interested and the facts be in the realm where they are susceptible of being perverted or misconceived the commission has the duty to appraise the credibility of the witness. We so held in the case of *West* v. *Industrial Commission et al.,* 90 Utah 262, 61 P. 2d 416.

For that reason I do not think that in every case where the commission denies an application for compensation the question can be asked,

"Is the conclusion of the commission that the result was not caused by the accident sustained by any substantial, competent evidence?"

There may be no competent evidence that it was so caused, but also none that the result was not caused by the accident. The applicant then simply fails to sustain his burden of persuasion. Or there may be competent evidence that it was so caused and nothing to contradict such evidence and still the commission might not be arbitrary in finding contrary to the evidence. *Norris* v. *Industrial Commission,* 90 Utah 256, 61 P. 2d 413. The question must be differently phrased: Was the commission arbitrary in arriving at its conclusion —that is, was it without basis of reason as judged by any reasonable mind, in arriving at its conclusion?

In the instant case, however, we have a definite event from which a chain of consequences followed and which furnish ample basis for high conjecture that the thrombophlebitis was the root source of the embolisms which finally caused death. The testimony of the doctors raises the conjecture to the level of definite conclusion based on evidence. We had a somewhat similar problem in the case of *Utah Fuel Co.* v. *Industrial Commission,* 102 Utah 12, 126 P. 2d 1070.

I do not think the opinion of Dr. Viko could be considered by the commission. But in this case it could not be prejudicial error because the commission in spite of that opinion found contrary to it. Hence, the opinion could not be said to have prejudiced the State Insurance Fund because it was against it and yet did not succeed in convincing the commission. On rehearing, however such report should not be introduced over defendants' objection without a right to cross examine.

BRONSON, District Judge (concurring).

I concur. I do so without considering the Viko letters. I desire to concur with what Mr. Justice WOLFE says in his separate concurring opinion, anent the Viko letter.

PRATT, J., on leave of absence.