STATE of Utah, Plaintiff and Appellee,

v.

Michael Lewis GREEN, aka James Alvin Douglas, Defendant and Appellant.

No. 890222–CA.

Court of Appeals of Utah.

May 23, 1990.

Daniel R. Knowlton, Salt Lake City, for defendant and appellant.

R. Paul Van Dam and Barbara Bearnson, Salt Lake City, for plaintiff and appellee.

Before BENCH, GREENWOOD and JACKSON, JJ.

## OPINION

JACKSON, Judge:

Defendant Michael Lewis Green appeals his convictions of two second-degree felonies, manufacturing a controlled substance and possession with intent to distribute a controlled substance, in violation of the Utah Controlled Substances Act, Utah Code Ann. § 58–37–8(1)(a)(i) and (iv) (Supp. 1988), respectively. We reverse.

■ The controlled substance involved in both counts was phenyl–2–propanone (P2P). Defendant asserts that certain provisions of the Utah Controlled Substances Act improperly delegated legislative power by permitting the United States Attorney General prospectively to add P2P as a controlled substance under the Utah criminal statute. Because it delegates the definition of the elements of, and the penalty for, a Utah crime, defendant argues, the statute violates article VI, section 1 of the Utah Constitution, which vests legislative power in the Utah Legislature.

The Utah Controlled Substances Act, enacted in 1971 Utah Laws, ch. 145 (effective January 1, 1972), established five schedules of specified drugs, Utah Code Ann. § 58–37–4 (1974), and defined a "controlled substance" in Utah Code Ann. § 58–37–2(5) (1974) as a drug, substance, or immediate precursor in those schedules. The legislature gave the Utah Attorney General prospective authority to designate a substance as an "immediate precursor," Utah Code Ann. § 58–37–2(23) (1974), and to reschedule substances, add substances to, or delete substances from the Utah schedules by following the procedures set forth in section 58–37–5. Utah Code Ann. §§ 58–37–3(2) to –3(7) (1974).

The Act was substantially amended in 1979 Utah Laws, ch. 12 (effective May 8, 1979). The definition of "controlled substance" was expanded beyond those drugs enumerated in the Utah schedules, to include a

drug, substance, or immediate precursor included in schedules I, II, III, IV or V of the Federal Controlled Substances Act (Title II, P.L. 91–513), as those schedules may be revised to add, delete, or transfer substances from one schedule to another, whether by Congressional enactment or by administrative rule of the United States Attorney General adopted pursuant to § 201 of that act.

Utah Code Ann. § 58–37–2(4) (Supp.1988).[1] Through 1979 Utah Laws, ch. 12, § 2, the delegation of prospective authority to the Utah Attorney General in sections 58–37–3(2) through –3(7) was stricken. In its place, the declaration of what substances were "controlled" was amended to add the following to those substances actually listed in the section 58–37–4 schedules:

(2) All controlled substances listed in the Federal Controlled Substances Act (Title II, P.L. 91–513), as it is amended from time to time, are hereby controlled.

(3) Whenever any substance is designated, rescheduled or deleted as a controlled substance in schedules I, II, III, IV or V of the Federal Controlled Substances Act (Title II, P.L. 91–513), as such schedules may be revised by Congressional enactment or by administrative rule of the United States Attorney General adopted pursuant to § 201 of that act [21 U.S. C.A. § 811], that subsequent designation, rescheduling or deletion shall govern.

Utah Code Ann. § 58–37–3 (1986).

When defendant was arrested and charged in September 1988, the Utah Controlled Substances Act, Utah Code Ann. § 58–37–8(1)(a)(i)–(iv) (Supp.1988),[2] set

---

1. The actual amendatory language varied slightly in form, but not in content, from that in effect when Green was arrested and charged. *See* 1979 Utah Laws, ch. 12, § 1. Although the subsection has undergone additional stylistic changes since 1988, the definition of controlled substances in Utah Code Ann. § 58–37–2(4) (1990) remains essentially the same.

2. Utah Code Ann. § 58–37–8(1)(a) (Supp.1988) provided:

(a) Except as authorized by this chapter, it is unlawful for any person to knowingly and intentionally:
(i) produce, manufacture, or dispense, or to possess with intent to produce, manufac-

forth four categories of prohibited acts involving controlled substances. The punishment for the proscribed conduct varied, as it does under the current version of the Act, depending on the schedule in section 58-37-4 in which the particular controlled substance was listed. A violation of section 58-37-8(1)(a) was punishable as a second-degree felony if it involved a substance from Schedule I or II; as a third-degree felony if the substance was classified in Schedule III or IV; and as a class A misdemeanor if the substance was classified in Schedule V. Utah Code Ann. § 58-37-8(1)(b)(i)-(iii) (Supp.1988).

In this case, Green was charged with possession and manufacture of P2P as a controlled substance. P2P was not listed as a controlled substance in the Utah schedules in section 58-37-4.[3] Nor was P2P listed as a controlled substance in the Federal Controlled Substances Act, 21 U.S.C.A. § 812 (1981), on the January 1, 1972, effective date of the Utah Controlled Substances Act, or on the May 8, 1979, effective date of the amendment of sections 58-37-2(5) and -3(3) of the Utah Act. Furthermore, P2P had not been added to the federal schedules by administrative action on those dates. However, the State asserts that P2P was administratively "added" to Utah's Schedule II after May 8, 1979, by the United States Attorney General, pursuant to the delegated authority in the 1979 amendment of sections 58-37-2(5) and -3(3). By administrative action effective February 11, 1980, the United States Attorney General placed phenylacetone (also known as phenyl-2-propanone, P2P, benzyl methyl ketone, or methyl benzyl ketone) on federal Schedule II as an immediate precursor to methamphetamine and amphetamine.[4] 21 C.F.R. § 1308.21 (1981); 44 Fed.Reg. 71822 (1979). Green responds that, because the delegation of legislative power to the federal officer in the 1979 amendment to the Utah Act violates the Utah Constitution, federal administrative action after May 8, 1979, adding P2P to the federal schedule could not validly add P2P to the Utah schedule of controlled substances.[5]

Before Utah's amendment of the Act in 1979, as discussed above, the Utah Legisla-

---

ture, or dispense, a controlled or counterfeit substance;
(ii) distribute a controlled or counterfeit substance, or to agree, consent, offer, or arrange to distribute a controlled or counterfeit substance;
(iii) possess a controlled substance in the course of his business as a sales representative of a manufacturer or distributor of substances listed in Schedules II through V except under an order or prescription;
(iv) possess a controlled or counterfeit substance with intent to distribute.

**3.** The Utah Controlled Substances Precursor Act, which took effect April 1, 1989, lists phenylacetic acid and phenylpropanolamine and their salts as precursor chemicals. Utah Code Ann. § 58-37c-2(5) (1990).

**4.** The 1979 amendment to the Utah Controlled Substances Act incorporated the Federal Controlled Substances Act, which was first enacted by Congress on October 27, 1970. 21 U.S.C.A. §§ 801 to 904 (1981). Section 811(e) allows the United States Attorney General to add "immediate precursors," defined in 21 U.S.C.A. § 802(34)(A) (Supp.1990), to the federal schedules of controlled substances without going through the normal administrative rulemaking process otherwise necessary for scheduling a drug or substance. This summary procedure was used by the United States Attorney General to amend 21 C.F.R. § 1308.12, effective February 11, 1980, by adding the following subsection to federal Schedule II:

(f) *Immediate precursors.* Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances:
(1) Immediate precursor to amphetamine and methamphetamine:
(i) Phenylacetone-8501
Some trade or other names: phenyl-2-propanone; P2P; benzyl methyl ketone; methyl benzyl ketone.
(2) Immediate precursors to phencyclidine (PCP):
(i) 1-phenylcyclohexylamine-7460
(ii) 1-piperidinocyclohexanecarbonitrile (PCC)-8603

**5.** Green's appeal does not involve a substance that, on the May 8, 1979, effective date of the amendment of the Utah Controlled Substances Act, was a federally scheduled controlled substance as the result of either federal administrative or congressional action. We, therefore, do not address the issue of the extent to which the Utah Legislature may, consistent with the state constitution, adopt another jurisdiction's laws and administrative rules defining the elements of a crime and the penalty therefor.

ture had vested authority in the Utah Attorney General to add substances to the Utah schedules by future administrative action. That delegation of legislative power was challenged in *State v. Gallion*, 572 P.2d 683 (Utah 1977), and held unconstitutional, perhaps prompting the 1979 legislative changes to the Act, which simply substituted a delegation of the same prospective lawmaking authority to the United States Attorney General.

■ The first question in *Gallion* was whether the 1979 enactment had violated the separation of powers provision in Utah Constitution article V, section 1, by granting power to the Utah Attorney General to, in effect, amend the Utah Controlled Substances Act by adding, deleting, or rescheduling a controlled substance. That section of the state constitution provides:

> The powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive, and the Judicial; and no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in the cases herein expressly directed or permitted.

The purpose of this state constitutional provision is to prohibit concentration of legislative and executive powers of the state government in one person. *See Gallion*, 572 P.2d at 686. Because there is no provision in the federal constitution comparable to article V, section 1 of the Utah Constitution, the court pointed out, federal case law concerning the delegation of legislative power is not helpful in interpreting the Utah constitutional provision. *Id.* As *Gallion* makes clear, the delegation doctrine in Utah is found in our state constitution, not in judicial decisions. The court held that, although article V, section 1 does not prohibit delegation of legislative power per se, it does bar the delegation of legislative functions to persons in the executive department, in order to avert concentration of power. *Id.* at 687. This holding concerning article V, section 1 is not applicable in

the present case because the 1979 changes in the Act conferred Utah legislative functions upon a person outside of state government, diffusing power, not concentrating it.

However, we agree with Green that the *Gallion* court's other holding, which pertains to the limits in Utah Constitution article VI, section 1 on the Utah Legislature's ability to delegate its legislative powers, is dispositive in his case.

Because Utah Constitution article VI, section 1 vests legislative power in the Utah Legislature, Green contends that the Utah Legislature could not constitutionally delegate to any person or agency the power to add P2P or anything else to those scheduled substances that are controlled under Utah law, and thereby define its manufacture or possession as a crime and fix the penalty for that crime.

In *Gallion*, a necessary element of the crime was that the proscribed conduct involve a controlled substance. There, the crime charged was the making of a false or forged prescription for a controlled substance. Here, a necessary element of the crime is that the proscribed conduct involve a controlled substance. Here, the crimes charged are the manufacture and possession of a controlled substance. In *Gallion*, the controlled substance, Demerol, was placed on Utah Schedule II by the Utah Attorney General through the mandated rulemaking process, so that any proscribed conduct involving it constituted a third-degree felony. Here, once the United States Attorney General administratively added P2P as a controlled substance on Utah Schedule II, any proscribed conduct involving P2P purportedly constituted a second-degree felony.

The Utah Supreme Court pointed out in *Gallion*, 572 P.2d at 687, that article VI, section 1 of the Utah Constitution, which vests legislative power in the Utah Legislature, limits the legislature's ability to delegate that power to others. Reiterating that there are certain "essential legislative functions" that cannot be delegated, *id.* at

688,[6] the *Gallion* court held that the "determination of the elements of a crime and the appropriate punishment therefor are, under our [Utah] Constitutional system, judgments, which must be made exclusively by the legislature." *Id.* at 690; *see also State v. Johnson,* 44 Utah 18, 137 P. 632 (1913) (it is for the legislature, not the courts, to define what constitutes criminal conduct).[7]

The Utah Supreme Court identified sound reasons for its ruling that the definition of a crime and the punishment for it are essential legislative functions that cannot be delegated to an administrative agency:[8] (1) criminal trials would be unduly complicated because a defendant could challenge the administrative procedures and findings underlying the scheduling of a substance; and (2) because administrative rulings are not codified, citizens would have to resort to records outside the Utah Code to determine the status of a particular substance.[9] *Gallion,* 572 P.2d at 689–90.

*Gallion* squarely held that crime definition and penalty powers are essential legislative functions that cannot constitutionally be delegated by the Utah Legislature to any other person or body. Nonetheless, the legislature's subsequent amendment of the Act in 1979 ignored the limits on delegation of its powers in Utah Constitution article VI, section 1, articulated by the *Gallion* court. Because we are unable to distinguish *Gallion* on this controlling point, we conclude that Utah Code Ann. § 58–37–3(3) (1986) and Utah Code Ann. § 58–37–2(4) (Supp.1988), violate article VI, section 1 of the Utah Constitution insofar as they allow the United States Attorney General to add substances to the Utah schedules of controlled substances after May 8, 1979. Accordingly, P2P was not a substance controlled by the statute under which Green was charged, and we are compelled to reverse Green's convictions on this ground.

■ In light of this conclusion, we need not address Green's remaining arguments.

6. *See also Tite v. State Tax Comm'n,* 89 Utah 404, 57 P.2d 734, 740–41 (1936) (power to determine amount of tax penalty is nondelegable legislative function); *Western Leather and Finding Co. v. State Tax Comm'n,* 87 Utah 227, 48 P.2d 526, 528 (1935) (imposition of a tax and designation of who must pay it are essential legislative functions, which legislature cannot delegate to state agency).

7. As the court noted in *Gallion,* 572 P.2d at 688, the state constitutional requirement that the essential legislative function of specifying and punishing conduct as criminal be performed by the legislature itself, not by administrative agency action, is incorporated into Utah Code Ann. § 76–1–105 (1978), which states: "Common law crimes are abolished and no conduct is a crime unless made so by this code, other applicable statute or ordinance."

8. Although the Utah Supreme Supreme Court has recognized that there is "a certain peril involved if administrative procedures can be applied to the criminal law," *Gallion,* 572 P.2d at 690, courts in other states have not been as perceptive. Intentionally or not, they have permitted administrative law principles, state and federal, to creep into their decisions and dictate their criminal law. For example, see *State v. Kellogg,* 98 Idaho 541, 568 P.2d 514, 516–18 (1977), in which the court cited state and federal administrative law decisions and Professor

Davis's treatise in a criminal case like *Gallion* involving the sale of a prescription drug. In *Kellogg,* scheduling of prescription drugs as controlled substances was statutorily delegated to the Idaho Board of Pharmacy. This delegation was upheld because the statute (1) contained a declaration of policy; (2) selected the agency to effectuate the policy; and (3) defined the limits of the Board's power. The court in *Montoya v. O'Toole,* 94 N.M. 303, 610 P.2d 190 (1980), involving possession of Valium, also used administrative law concepts. There, the legislature had delegated to the State Board of Pharmacy the power to schedule drugs and controlled substances under New Mexico criminal law. The delegation was upheld because the delegation was accompanied with strict guidelines, clear standards, and definite duties. The court, using administrative law principles, found this scheme to allow the Board only minimal discretion in the fact-finding function and to give the Board no discretion in enacting substantive law.

9. The State makes a public policy argument in support of the Utah Legislature's delegation of lawmaking authority to the United States Attorney General, namely, the "enormous burden" placed on the legislature to monitor thousands of new drugs developed each year. *See Kellogg,* 568 P.2d at 517; *Montoya,* 610 P.2d at 192. There is, however, nothing in this record to support these claims.

However, we need to delineate the scope of our constitutional ruling.

Defendant has not challenged the entire Utah Controlled Substances Act as unconstitutional. *See* note 5, *supra.* He has attacked only the provisions added by the 1979 amendments to the Act, effective May 8, 1979, in which the United States Attorney General was granted prospective legislative power to amend the Utah statute by adding, deleting, or transferring substances on the federal schedules.

 The applicable rule of statutory construction in such circumstances is that statutes, where possible, are to be construed so as to sustain their constitutionality. Accordingly, if a portion of the statute might be saved by severing the part that is unconstitutional, such should be done. *Celebrity Club Inc. v. Utah Liquor Control Comm'n,* 657 P.2d 1293, 1299 (Utah 1982). This basic rule applies to the construction of criminal statutes. *State v. Nielsen,* 19 Utah 2d 66, 426 P.2d 13, 15 (1967). Where part of a statute is unconstitutional, severability is primarily a matter of legislative intent, *Salt Lake City v. International Ass'n of Firefighters,* 563 P.2d 786, 791 (Utah 1977), which a court ascertains by determining whether the remaining portions of the enactment can stand alone and serve a legitimate purpose. *Berry v. Beech Aircraft Corp.,* 717 P.2d 670, 686 (Utah 1985).

The provisions challenged by Green were apparently added to the Act separately as a response, albeit an inadequate one, to the decision in *Gallion.* We believe the legislature intended that the remaining provisions be enforced independent of the 1979 amendments for the legitimate purpose of punishing conduct involving those substances expressly included in the schedules in section 58-37-4. The remaining provisions were enforced in this same manner during the period between the *Gallion* decision on November 17, 1977, and the effective date of the 1979 amendment of the

Act. We conclude that Utah Code Ann. § 58-37-3(3) (1986) and the portion of Utah Code Ann. § 58-37-2(4) (Supp.1988) delegating legislative power to the United States Attorney General are severable from the remaining portions of the Utah Controlled Substances Act.

The convictions are reversed.

GREENWOOD, J., concurs.

BENCH, Judge, concurring and dissenting:

I agree that the Controlled Substances Act passes constitutional muster under article V, section 1, of the Utah Constitution. I disagree, however, with the majority's conclusion that the Act violates article VI, section 1.

When we are faced with a challenge to the constitutionality of a statute, we must adhere to the rule that "legislative enactments are endowed with a strong presumption of validity and will not be declared unconstitutional unless there is no basis upon which they can be construed as conforming to constitutional requirements." *In re Criminal Investigation,* 754 P.2d 633, 640 (Utah 1988) (citing *Greaves v. State,* 528 P.2d 805, 806–07 (Utah 1974)).

The main opinion reverses defendant's convictions on the authority of *State v. Gallion,* 572 P.2d 683 (Utah 1977). The narrow holding of *Gallion* is that the former Act was an unconstitutional violation of the separation of powers doctrine of article V since it allowed the executive in charge of enforcing the law to exercise legislative functions. The *Gallion* opinion could have, and for clarity's sake arguably should have, stopped there. Instead, it went on to talk about improper legislative delegation.

My colleagues suggest that this dicta was framed under article VI. I disagree. The legislative delegation discussion in *Gallion* was framed under statute and case law.[1] The statute, Utah Code Ann. § 76-1-105 (1974), provided as follows:

---

1. In *Gallion,* "the Utah Supreme Court affirmed on grounds that the Constitution of Utah prohibits the legislature from delegating both legisla-

tive and executive powers to a single person, and further, that the power to define conduct as criminal is exclusively reserved to the legisla-

"Common law crimes are abolished and no conduct is a crime unless made so by this code, other applicable statute or ordinance." The case, *State v. Johnson*, 44 Utah 18, 137 P. 632 (1913), held that under *article V* (not VI), courts may not denounce and punish as crimes acts and omissions not made punishable by statute.

By enacting the Controlled Substances Act, the legislature has criminalized the manufacture, distribution, and possession of controlled substances. *See* Utah Code Ann. § 58–37–8(1)(a) (1990). The legislature has given a federal agency the task of identifying the particular substances to be controlled. Such delegation of responsibility is not, on its face, an unconstitutional delegation of legislative power. *See* Williams, *Police Rulemaking Revisited: Some New Thoughts on an Old Problem*, 47:4 Law & Contemp.Probs. 123 (Autumn 1984). Whether our statute is unconstitutional should turn not on article VI, but on whether the legislature has adequately identified standards and procedural safeguards for the placement of substances on the schedules. *See generally*, Davis, *A New Approach to Delegation*, 36 U.Chi.L. Rev. 713 (1969).

From a practical viewpoint, the prohibition against legislative delegation cannot be absolute. As explained by Justice Crockett in his concurring opinion in *Gallion:*

> [D]ue to the complexities of human society, which are ever increasing, the function of the legislative branch must necessarily be that of a general policy making body and that it cannot spell out all of the details of the administration and application of law. Consequently, it is necessary that the executive branch (e.g., administrative agencies ...), in order to carry out the responsibilities imposed upon them, have the power to make rules and regulations that must be complied with, and that failure to comply must have sanctions or penalties, and that they therefore must have the force of law.

572 P.2d at 690.

In addition to the Controlled Substances Act, other legislation has defined the gen-

eral crime and then left to an administrative agency the responsibility of specifying the prohibited activity. As long as the rules and regulations promulgated under such legislation meet due process requirements, they should be enforceable.

I cannot reverse this case solely on the authority of *Gallion.*

ture by both statute and case law." 1978 Utah L. Rev. 399 (footnotes omitted).